**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 16 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

FIKRI SOUSSI,

      Defendant-Appellant.

No. 01-1251

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 92-CR-85-N)**

---

James C. Murphy (John W. Suthers, United States Attorney, and James A. Allison, Assistant United States Attorney with him on the brief), Assistant United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

Vicki Mandell-King (Michael G. Katz, Federal Public Defender, with her on the briefs), Assistant Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

---

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

---

**BRORBY**, Senior Circuit Judge.

---

Fikri Soussi appeals his conviction for wilfully, knowingly, and unlawfully participating in a transaction involving the export of goods from the United States to Libya in violation of 50 U.S.C. §§ 1702 and 1705(b), otherwise known as the International Emergency Economic Powers Act. We affirm the conviction.

## BACKGROUND

Mr. Soussi was born in Benghazi, Libya, but has since become a naturalized United States citizen. He is the president and sole employee of Oasis International, Inc., an export company located and incorporated in Colorado ("Oasis Colorado").

In early 1991, Mr. Soussi, acting on behalf of Oasis Colorado, requested price quotations from foreign trailer manufacturers for a shipment of fifty trailers to Benghazi, Libya. Around this same time, Mr. Soussi prepared a price quotation for Mohamed Buzied, detailing the cost of different trailer models to be shipped to Benghazi, Libya. Mr. Soussi also received an order of "50 [trailers] to Benghazi" from Zoo Park-Benghazi in March 1991.

In May that same year, Mr. Soussi began soliciting price quotes from United States manufacturers for the purchase of fifty trailers. Mr. Soussi gave

each manufacturer different information about where the trailers would be shipped, specifying Egypt, Saudi Arabia, or Kuwait. He asked two manufactures if the trailers could be shipped without any markings revealing the manufacturer's origin.

Mr. Soussi also asked at least one United States manufacturer the price of air conditioners for the trailers. The manufacturer responded by sending Mr. Soussi a fax listing the price of installed and uninstalled air conditioners. This fax was later in Mr. Soussi's possession, with the handwritten words "to Libya" on it. The manufacturer testified the words were not on the fax when he sent it to Mr. Soussi.

Ultimately, Mr. Soussi purchased fifty trailers from Dutchmen Manufacturing ("Dutchmen"), in Goshen, Indiana. Although Mr. Soussi told Dutchmen that Saudi Arabia or Egypt was the final destination of the trailers, the purchase order only required Dutchmen to deliver the trailers to Euram Sales Corporation in Baltimore. Mr. Soussi's early correspondence to Dutchmen was written using letterhead with the name Oasis Colorado. However, the purchase order for the trailers did not mention Mr. Soussi or the Colorado corporation. Instead, the purchase order listed S. Ameri, with Oasis International [Guernsey],

Limited, Abu Dhabi, United Arab Emirates. "S. Ameri" apparently refers to Sar Ameri, who is the wife of Mr. Soussi's brother, Mosadak Soussi. Mosadak Soussi owns Oasis Oilfields, in Abu Dhabi, United Arab Emirates ("Oasis Oilfields"). Oasis Oilfields services oilfields with chemicals and spare parts. In order to obtain more competitive pricing for Oasis Oilfields, Mosadak Soussi also incorporated Oasis International [Guernsey] Limited ("Oasis UK"). Mosadak Soussi's businesses were completely separate from Fikri Soussi's Oasis Colorado.

Dutchmen prepared an invoice for the trailers and sent it to Fikri Soussi. A few weeks later, Mr. Soussi called Dutchmen and asked it to change the invoice to show the purchaser as Oasis UK. Dutchmen asked Mr. Soussi to verify Oasis UK's address. Mr. Soussi complied by faxing a sheet of letterhead from his Colorado office with the name Oasis UK. After Dutchmen had shipped the trailers, it issued Mr. Soussi an invoice listing Oasis UK as the purchaser. Dutchmen never dealt with anyone other than Fikri Soussi.

After the trailers arrived in Baltimore, Maersk Line shipped them to La Spezia, Italy. The bill of lading listed Euram Sales as the shipper but did not specify a receiving party. It did, however, identify Oasis UK as the party to be notified when the shipment arrived in Italy. The bill of lading also contained a

clause stating: "These commodities licensed by U.S. for ultimate destination Italy. Diversion contrary to U.S. law prohibited."

When questions developed over some of the shipping charges on the bill of lading, Fikri Soussi called Maersk Line. He identified himself as being with Oasis and said he was the shipper on the bill. The representative form Maersk Line was initially reluctant to discuss the shipment with Mr. Soussi because the bill of lading did not show Mr. Soussi as the shipper. However, after noting Oasis UK was the party to be notified, and assuming Mr. Soussi was affiliated with Oasis UK, the representative asked Mr. Soussi to send him a fax detailing his specific concerns. Mr. Soussi complied, sending a fax on Oasis Colorado letterhead from a Colorado number. Mr. Soussi's questions about the charges were eventually resolved.

While the trailers were in La Spezia, a representative from a different shipping company presented documents to Italian Customs showing it intended to ship the trailers to Benghazi, Libya. One of the documents was an invoice for sale of the trailers by Oasis UK to Zoo Park in Benghazi, Libya. Before the trailers were shipped, United States Customs received a tip the trailers were destined for Libya. Consequently, Customs detained the trailers.

After Customs detained the trailers, a United States Customs agent received a call from a representative of Euram Sales, the shipper mentioned on the bill of lading. The Euram representative gave the agent the name Marino Torti. Mr. Torti told the agent he was acting on behalf of Oasis UK and Oasis Oilfields. He confirmed the trailers were going to be shipped to Libya. Because Customs officials maintained the trailers could not legally be sent to Libya, Mr. Torti searched for alternative buyers in other countries. During this time, Fikri Soussi met with Mr. Torti in Milan, Italy to determine whether the trailers could be shipped to Egypt. Eventually the trailers were shipped to Egypt.

In connection with the detention, United States Customs conducted a thorough investigation into Mr. Soussi, Oasis Colorado, and Oasis UK. Investigators learned Mr. Soussi's then girlfriend designed the Oasis UK stationary Mr. Soussi used when Dutchmen requested Mr. Soussi to confirm Oasis UK's address. The stationary was printed in Boulder, Colorado. Upon calling the telephone number for Oasis UK, investigators reached Ria Brothers, an English company that represents foreign corporations. Ria Brothers told the investigators Oasis UK was "inactive" and they did not have any records for Oasis UK. Investigators examined Mr. Soussi's telephone records but did not find any calls placed to the Oasis UK number.

> Unites States Customs agents arrested Mr. Soussi and charged him with
>
> willfully, knowingly, and unlawfully participat[ing] in a transaction involving the purchase of 50 [trailers] manufactured in the United States and their export from the United States with the ultimate intended destination of Libya, and this transaction had the purpose of evading and avoiding the prohibition of the exportation of goods from the United States to Libya.

Mr. Soussi was also charged with conspiring to commit the substantive offense. After the prosecutor's case-in-chief, the district court granted a judgment of acquittal on the conspiracy count. Ultimately, a jury convicted Mr. Soussi of the substantive count.

## DISCUSSION

The International Emergency Economic Powers Act, under which Mr. Soussi was convicted, authorized the President "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a)(1991).[1]

---

[1] The International Emergency Economic Powers Act has been amended since 1991. However, we apply the law at the time Mr. Soussi committed the crime.

Pursuant to the International Emergency Economic Powers Act, the President issued Executive Order No. 12,543.  It prohibited "[t]he export to Libya of any goods, technology (including technical data or other information) or services from the United States."  Exec. Order No. 12,543 § 1(b), 3 C.F.R. 181 (1986).  The Order also prohibited "[a]ny transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order."  *Id.*, § 1(h).

Through the Executive Order, the President authorized the Secretary of Treasury to promulgate rules and regulations to carry out the purpose of the Executive Order.  *Id*., § 4.  These regulations closely followed the Executive Order.  They provided "[e]xcept as authorized, no goods, technology (including technical data or other information) or services may be exported to Libya from the United States."  31 C.F.R. § 550.202 (1991).  Like the Executive Order, the regulations prohibited "[a]ny transaction for the purpose of, or which has the effect of, evading or avoiding any of the prohibitions set forth in [the regulations]."  31 C.F.R. § 550.208 (1991).

The International Emergency Economic Powers Act itself provided the penalty for failing to comply with the Executive Order or Department of Treasury

regulations. It stated: "Whoever willfully violates any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both." 50 U.S.C. § 1705(b) (1991).

Mr. Soussi offers six reasons why his conviction should not be sustained under the International Emergency Economic Powers Act, Executive Order 12,543, and related regulations. We reject each of his arguments in turn.

## I.    Effect of Trailers Never Entering Libya

Mr. Soussi first argues, since the trailers never entered Libya, his actions amount to no more than an attempt to export trailers to Libya. He claims his "conviction cannot be sustained where the evidence proved no more than an attempt, and neither the federal statute, 50 U.S.C. § 1705(b), at the time of the offense, nor the executive order and regulations, include attempt to export to Libya as a crime."

After conducting a de novo review of the International Emergency Economic Powers Act, *see United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994), we reject Mr. Soussi's argument. The 1991 statute clearly criminalizes any

violation of orders or regulations issued under the Act.  50 U.S.C. § 1705(b) (1991) ("Whoever wilfully violates any license, order, or regulation issued under this chapter ... may be imprisoned for not more than ten years.").  The Executive Order prohibits "[a]ny transaction by any United States person which evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in this Order."  Exec. Order No. 12,543 §1(h), 3 C.F.R. 1181 (1986).  The regulations prohibit "[a]ny transaction for the purpose of, or which has the effect of, evading or avoiding any of the prohibitions set forth in [the regulations]."  31 C.F.R. § 550. 208 (1991).  The evidence demonstrated Mr. Soussi wilfully engaged in transactions for the purpose of evading or avoiding the ban on exports to Libya.[2]  Since engaging in the transactions alone was prohibited conduct, Mr. Soussi's conduct cannot fairly be categorized as an attempt.

Mr. Soussi offers several arguments in hopes of persuading us to give less than full weight to the language of the Executive Order and regulations.  He claims "the language 'any transaction which evades or avoids,' like the statute, contemplates a completed or successful evasion or avoidance."  He believes the language in the Executive Order was only meant to define the specific intent

_____

[2]  The weight of evidence against Mr. Soussi is fully discussed in Part III of this opinion.

-10-

necessary to violate the export ban. Mr. Soussi does not provide, nor can we find, any support for this argument.

Mr. Soussi next argues "the language of the Executive Order cannot proscribe an attempt where the statute itself does not." Mr. Soussi appears to argue that if the Executive Order prohibits his conduct, then the Order went beyond the power delegated to the President in the Emergency Economic Powers Act. We disagree with Mr. Soussi. Under the Act, "[t]he President's authority is limited to meeting a foreign threat 'to the national security, foreign policy or economy of the United States,' that is 'unusual and extraordinary,' and only then if he is able to declare the threat a 'national emergency.'" *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993) (citing 50 U.S.C. § 1701). Subject to these limitations, the Act grants the President authority to define criminal conduct. *See* 50 U.S.C. § 1702. We conclude prohibiting transactions designed to avoid the Libyan export ban falls well within the authority delegated to the President by Congress.

Mr. Soussi also calls our attention to a 1996 amendment to the penalty section of the International Emergency Economic Powers Act. The Act now reads: "Whoever willfully violates, *or willfully attempts to violate*, any ...

regulation issued under this chapter ... may be imprisoned for not more than ten years." 50 U.S.C. § 1705(b) (2002) (emphasis added). Thus, Mr. Soussi argues "there would be no need to have amended the statute if the language ... contained in the Executive Order and [31 C.F.R.] § 550.208, were sufficient to cover an attempt." In support of his position, Mr. Soussi directs us to a small piece of congressional testimony. The testimony states: "During the course of many investigations, a loophole in [the Act] has been identified: parties that attempt to export a commodity to a 'sanctioned' country but fail, for whatever reason, including interception of the shipment prior to entering the export stream, do not violate [the Act]." *Weapons Proliferation Staff Statement (Minority Staff), Hearings on Global Proliferation of Weapons of Mass Destruction: Illicit Trafficking in Nuclear Materials, Before the U.S. Senate Permanent Subcommittee on Investigations*, 104th Cong. (1996)*, available at* 1996 WL 7137464. Consequently, Mr. Soussi asks us to conclude he did not violate the Act because his actions occurred before the words "or willfully attempts to violate" were added.

Mr. Soussi's argument, although facially persuasive, again misses the mark. Even assuming Mr. Soussi's morsel of legislative history was sufficient to show an attempt to export goods to Libya was not illegal in 1991, we must emphasize

Mr. Soussi was not charged with attempting to export goods to Libya. Mr. Soussi was charged with, and convicted of, wilfully, knowingly, and unlawfully participating in transactions with the purpose of evading and avoiding the Libyan export ban. The Executive Order and related regulations, under specific Congressional authority, prohibited this conduct in 1991 before Congress amended the International Emergency Economic Powers Act in 1996. We must, consequently, conclude Mr. Soussi's conduct was prohibited in 1991, even though the trailers never actually reached Libya.

## II.     Constitutionality of Executive Order and Related Regulations

Mr. Soussi next argues "[t]he Executive Order and related regulations are unconstitutionally vague as applied to [him]." He asserts the Executive Order does not clearly prohibit a United States citizen from helping a foreign company export goods from the United States to Libya. He also claims the regulations are ambiguous concerning an exception to the export ban when the goods "come to rest" in a third country.

Because whether the Executive Order and related regulations are vague is a question of law, we apply a de novo standard of review. *United States v. Agnew*, 931 F.2d 1397, 1503 (10th Cir. 1991). According to the Supreme Court, "a penal

statue [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "That the government might, without difficulty, have chosen clearer and more precise language equally capable of achieving the end which it sought does not mean that the [regulations] which it in fact drafted [are] unconstitutionally vague." *United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 77 (2d Cir. 1986) (alterations in original; quotation marks omitted). Instead, an executive order and regulations are unconstitutionally vague only if they subject a potential defendant "'to some risk or detriment without giving him fair warning of the nature of the proscribed conduct.'" *Id.* (quoting *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 740 (1970)).

### A.    United States Citizens Aiding Foreign Corporations

Although Mr. Soussi recognizes the Executive Order "prohibits any transaction by a United States person that 'evades or avoids, or has the purpose of evading or avoiding,'" the export ban, Mr. Soussi believes "the Order does not clearly prohibit participation by a United States person in a transaction in which a *foreign* company exports United States goods to Libya." (Emphasis in original.)

We conclude the Executive Order and related regulations clearly prohibited Mr. Soussi's conduct. They are not unconstitutionally vague. We again stress Mr. Soussi was not charged with, or convicted of, exporting trailers to Libya. He was convicted of engaging in transactions which had the purpose of evading or avoiding the export ban. The Executive Order and regulations specifically prohibited transactions designed to evade or avoid the Libyan export ban. Exec. Order No. 12543, 3 C.F.R. 181 (1986); 31 C.F.R. § 550.208 (1991). Mr. Soussi engaged in transactions designed to evade the export ban by making it look as though a foreign company was the exporter, when in fact, a United States citizen and his domestic company were the driving forces behind the transactions. This conduct was clearly prohibited by the Executive Order and related regulations.

**B.**     **Exported Goods Transformed or Coming to Rest in a Third Country**

Mr. Soussi also asks us to consider what he calls an ambiguity in the regulations designed to address instances where goods are exported from the United States to a third country before being shipped to Libya. According to Mr. Soussi, "Section 550.409(a), 31 C.F.R., states that such export to a third country is *prohibited* where the goods do not come to rest in a third country *and* are not substantially transformed or incorporated into manufactured products." (Emphasis in original.) "In contrast," Mr. Soussi argues "subsection (d) states that

-15-

such exports are *not prohibited* if the goods come to rest in a third country *or* are substantially transformed or incorporated into manufactured products." (Emphasis in original). Mr. Soussi believes, because the conjunctive "and" was used in subsection (a) and the disjunctive "or" was used in subsection (d), the regulations are vague and did not give "notice of [the] proscribed conduct."

After reviewing the regulations and arguments posed by Mr. Soussi, we conclude there is no ambiguity. It is useful first to consider the text of the two subsections. Subsection (a) provides:

> Exports of goods or technology ... from the United States to third countries are prohibited if the exporter knows, or has reason to know, that:
>
> ... The goods ... are intended for transshipment to Libya ... without coming to rest in a third country and without being substantially transformed or incorporated into manufactured products in a third country ....

31 C.F.R. § 550.409(a)(1) (1991). Subsection (d) provides:

> Exports of goods or technology from the United States to third countries are not prohibited where the exporter has reasonable cause to believe that:
>
> > (1) Except as otherwise provided in paragraph (a) of this section, the goods will be substantially transformed or incorporated into manufactured products before export to Libya, or
> >
> > (2) The goods will come to rest in a third country for purposes other than reexport to Libya, e.g., for purposes

-16-

of restocking the inventory of a distributer whose sales
of the particular goods are not predominantly to Libya
....

31 C.F.R. § 550.409(d) (1991). Although the regulations could have been more artfully drafted, they are consistent. Subsection (a) admonishes an exporter his shipment is illegal if he knows or has reason to know both that the goods will not come to rest in a third country and that the goods will not be substantially transformed or incorporated. 31 C.F.R. § 550.409(a) (1991). Both conditions must be present for the shipment to be illegal. *Id.* If, on the other hand, one of the conditions from subsection (a) is not present, the shipment is not illegal. 31 C.F.R. § 550.409 (a), (d) (1991). Stated differently, if the exporter has reasonable cause to believe the goods will either be transformed or will come to rest in a third country, then the shipment is not illegal. 31 C.F.R. § 550.409(d) (1991). In short, we conclude the regulations can be harmoniously applied and are not excessively confusing or unconstitutionally vague.

## III.   Sufficiency of the Evidence

In an argument closely related to the previous argument, Mr. Soussi argues "[t]he evidence was insufficient to prove that [he] willfully participated in a transaction to evade or avoid the prohibition of Executive Order No. 12543 and related regulations." He states that "[a]t best, the evidence showed that [he]

negotiated the purchase of 50 Dutchmen trailers by a British company owned by his brother." Because it is not against United States law for a British company to export goods to Libya, Mr. Soussi argues his "transaction did not evade or avoid" the Libyan export ban. Moreover, Mr. Soussi claims he did not know his actions would be construed as violating the ban, and therefore his actions cannot be construed as a wilful violation of the Executive Order or regulations.

We review a sufficiency of the evidence claim de novo. *United States v. Lewis*, 240 F.3d 866, 870 (10th Cir. 2001). In conducting this review, we "ask only whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999).

Here there was ample evidence for the jury to conclude Mr. Soussi engaged in transactions for the purpose of avoiding the export ban. Among other things, the evidence demonstrated, after Oasis Colorado received an order for fifty trailers from a Libyan company, Mr. Soussi solicited price quotes for exactly fifty trailers from United States trailer manufacturers. He asked the manufacturers if

they could remove some of the markings showing the trailers were manufactured in the United States. One of the price quotes was found in Mr. Soussi's possession with the words "to Libya" printed on it. Mr. Soussi negotiated with Dutchmen, a United States trailer manufacturer, telling Dutchmen he was with Oasis Colorado and using Oasis Colorado letterhead. Dutchmen was so convinced it was dealing with Mr. Soussi and Oasis Colorado that it issued the invoice to Oasis Colorado for exactly fifty trailers. When Dutchmen asked Mr. Soussi to verify the address of Oasis UK before changing the invoice, Mr. Soussi's girlfriend had Oasis UK letterhead printed in Colorado and Mr. Soussi faxed the letterhead from his Colorado office. Mr. Soussi was the only person to deal with Dutchmen about the trailers. When questions arose over the shipping costs, Mr. Soussi handled the matter by telling the shipping company the trailers were his and sending correspondence on Oasis Colorado letterhead. When Customs detained the trailers, Mr. Soussi flew to Italy to deal with the problem. From this evidence, it was reasonable for the jury to conclude Mr. Soussi knew about the export ban but engaged in transactions for the purpose of avoiding it. The evidence was more than sufficient to support Mr. Soussi's conviction.

## IV.   Jury Instruction Regarding Exception to Export Ban

Mr. Soussi next claims "[t]he district court committed reversible error in

-19-

failing to instruct the jury regarding the exception to the prohibition of exports to Libya in 31 C.F.R. § 550.409(d), where the goods come to rest in a third country." Specifically, Mr. Soussi requested the jury be instructed:

> Exports of goods ... from the United States to third countries are not prohibited where the exporter has reasonable cause to believe that;
>
> (1) ... the goods will be substantially transformed or incorporated into manufactured products before export to Libya, or
>
> (2) The goods will come to rest in a third country for purposes other than reexport to Libya ....

The district court declined to offer the "come to rest" instruction because it concluded there was no evidence Mr. Soussi had reasonable cause to believe the goods would be transformed. Since there was no evidence the trailers were transformed, the district court concluded Mr. Soussi's instruction was not warranted. The court stated, "I think that it's clear ... that the goods have to come to rest and be substantially transformed" for the "coming to rest" instruction to apply. Although the district court declined to give an exact meaning of the phrase "come to rest," the court concluded it was not enough for the goods to "stop in a port overnight or for two nights or five nights and then go on to Libya."

We review the district court's decision not to give the "come to rest" instruction "for abuse of discretion and consider the instructions as a whole de

novo to determine whether they accurately informed the jury of the governing law." *United States v. Cerrato-Reyes,* 176 F.3d 1253, 1262 (10th Cir. 1999); *see also Telecor Communications, Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1141 (10th Cir. 2002). *cert. denied*, 122 S. Ct. 1384 (2002); *United States v. McPhilomy*, 270 F.3d 1302, 1310 (10th Cir. 2001).

After reviewing the record and district court opinion, we are convinced the district court erred in its reason for refusing to offer the "come to rest" instruction. However, we stop short of concluding the district court committed actual error. Instead, we conclude any error was harmless. We will explain first why we cannot agree with the district court's reasoning, and then discuss why any error was harmless.

Mr. Soussi contends the district court erred in denying the request for the jury instruction because the court mistakenly believed the trailers had to be substantially transformed *and* come to rest in a third country in order to escape the export ban. The district court was under the erroneous belief that Mr. Soussi needed to present evidence the trailers would be substantially transformed, as well as evidence the trailers would come to rest. As we explained in Part II.B, a shipment is not illegal if the exporter has reasonable cause to believe either the

-21-

goods will be transformed or the goods will come to rest. 31 C.F.R. § 550.409(d) (1991). We conclude Mr. Soussi's requested instruction was an accurate statement of the law.[3]

Assuming Mr. Torti's testimony provided a sufficient foundation for the "come to rest" instruction, Mr. Soussi acknowledges we may affirm the district court's decision if failing to give the instruction amounts to harmless error. *Neder v. United States*, 527 U.S. 1, 9 (1999). In this case, the error is harmless unless " the error ... had substantial influence" on the outcome of the trial "or if one is left in grave doubt" as to its influence. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

In performing our harmless error analysis, we find it useful to consider the meaning of the phrase "come to rest." While the regulations do not define "come

---

[3] The fact Mr. Soussi's instruction was an accurate statement of the law did not automatically require the district court to give his requested instruction. "[I]t is elementary that a defendant in a criminal case is entitled to instructions delineating a particular theory of defense only if there is a sufficient foundation in the evidence." *Devine v. United States*, 403 F.2d 93, 95 (10th Cir. 1968). However, we decline to decide whether there was sufficient foundational evidence to support the "come to rest" instruction. Instead, we resolve the issue using harmless error analysis.

to rest," they do offer some guidance as to what "come to rest" means.[4]

According to the regulations,

> [e]xports of goods ... from the United States to third countries are not prohibited where the exporter has reasonable cause to believe that:
>
> ....
>
> ... The goods will come to rest in a third country for purposes other than reexport to Libya, e.g., for purposes of restocking the inventory of a distributor whose sales of the particular goods are not predominantly to Libya.

31 C.F.R. § 550.409(d)(2) (1991). Consequently, in order for the "come to rest" exception to apply to Mr. Soussi, the regulations require the trailer to have been exported to Italy for some purpose other than simply forwarding them to Libya. It is not enough for Mr. Soussi to show the trailers spent time in Italy on their shipping route to Libya.

Mr. Soussi believes any error was not harmless because "there was evidence to support the proposition that the trailers were to 'come to rest' prior to transshipment to Libya." He claims Marino Torti's testimony established "the buyer of the trailers changed several times, before ... the trailers arrived in Italy."

---

[4] Mr. Soussi also argues the term "come to rest" is unconstitutionally vague. Because the regulations offer sufficient guidance as to what "come to rest" means, we reject this argument.

Mr. Torti testified Mosadak Soussi told him an Italian "potential buyer" cancelled his agreement requiring Oasis UK, "in panic" to sell the goods to a Libyan company.[5]  Mr. Soussi argues the amount of evidence against him is small when compared with this testimony.

After reviewing Mr. Torti's testimony, the exhibits, and the other evidence presented at trial, we conclude any error in admitting the exhibits was harmless. Although Mr. Torti testified Mosadak Soussi told him the goods were originally sold to an Italian buyer, there is nothing in Mr. Torti's testimony to suggest Fikri Soussi ever knew about an Italian purchaser.  Furthermore, other evidence presented at trial uniformly states Fikri Soussi thought the goods were destined for Libya from the beginning of his involvement in the transactions.  The only purchase order and invoice for the trailers found in Mr. Soussi's office showed

_____

[5]  Mr. Soussi also argues the buyer for the trailers changed after the trailers arrived in Italy.  This argument is a red herring because actions taken after the trailers were detained by Customs are irrelevant.  The regulations specify exports are not prohibited "*where the exporter has reasonable cause to believe ...* the goods will come to rest in a third country for purposes other than reexport to Libya."  31 C.F.R. § 550.409(d)(2) (1991) (emphasis added).  When Mr. Soussi entered into the transactions to evade the ban on exports to Libya, he had no way of knowing the trailers would be detained by Customs.  It would not matter whether Mr. Soussi rerouted the trailers after they were detained by Customs because Mr. Soussi could not have had reasonable cause to believe this would occur when he initially engaged in transactions designed to evade the export ban.

the trailers were ordered by and sold to Zoo Park [Benghazi], Libya. In fact, Mr.

Soussi's closing argument at trial stated: "You know if you look at the

documents that are in Fikri Soussi's office, there may be dozens of them, maybe

40, 50, 60, all with the words Benghazi, Libya clearly spelled out." Given the

incredible weight of evidence that Mr. Soussi knew the trailers were destined for

Libya, any error in denying the instruction was harmless.[6]

## V.     Deliberate Ignorance Jury Instruction

Mr. Soussi's next argument also involves a perceived deficiency in the jury

instructions. He argues "[t]he evidence did not support the court's decision to

instruct the jury on deliberate ignorance."

The district court should only give a deliberate ignorance jury instruction

"when the prosecution presents evidence that the Defendant purposely contrived

---

[6] Mr. Soussi argues any error was not be harmless because "[t]he jury struggled with reaching a verdict in this case, thrice telling the court it was deadlocked." While the length of time the jury deliberates may sometimes be a factor in determining whether an error is harmless, *United States v. Howell*, 285 F.3d 1263, 1271 (10th Cir. 2002), we, nevertheless, conclude any error in denying the jury instruction was harmless in this case. Here the case was submitted to the jury after a nearly six day trial. After this lengthy trial, concerning subject matter that was probably unfamiliar to many of the jurors, the jury deliberated for less than one full day. This amount of deliberation in Mr. Soussi's case is not enough to convince us any instructional error was prejudicial rather than harmless.

to avoid learning all the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Espinoza*, 244 F.3d 1234, 1242 (10th Cir. 2001) (quotation marks and citation omitted). "[T]he fact that an objective reasonable person would have had knowledge is immaterial." *Id.* at 1242. The relevant inquiry is whether Mr. Soussi "had subjective knowledge of his criminal behavior," *United States v. Delreal-Ordones*, 213 F.3d 1263, 1268 (10th Cir.), *cert. denied*, 531 U.S. 915 (2000), but purposely and deliberately avoided actual knowledge of the operant facts, *Espinoza*, 244 F.3d at 1242-43.

Typically, "[w]e review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *McPhilomy*, 270 F.3d at 1310. Notwithstanding this general rule, "we have repeatedly applied a de novo standard to review the propriety of a deliberate ignorance instruction." *Delreal-Ordones*, 213 F.3d at 1264 n.2. "In other contexts, however, we have applied an abuse of discretion standard to the district court's decision to give a particular criminal instruction." *Id.* We need not resolve the apparent conflict because, in this case, we can uphold the district court's decision using the less deferential de novo standard.

Here, the district court gave the deliberate ignorance instruction based on the testimony of two of Mr. Soussi's business associates. Both associates testified they gave Mr. Soussi a document prepared by the United States Department of the Treasury entitled "Libya: What You Need to Know About the U.S. Embargo." Both business associates testified Mr. Soussi quickly skimmed and dismissed the document. The district court concluded this evidence was sufficient "to allow the jury to infer that [Mr. Soussi] was avoiding the means of knowing that what he was doing is violating the law."

Mr. Soussi claims the evidence was insufficient to warrant the deliberate ignorance instruction because the document he received from his business associates did "not indicate whether a person in Mr. Soussi's situation could assist a foreign company, not subject to the prohibition, in sending goods to Libya." We reject this argument. The document given to Mr. Soussi stated "no goods, technology, or services may be exported from the United States to Libya, either directly or through third countries." The document also specified the embargo and accompanying regulations apply to "all U.S. citizens and permanent residents wherever they are located, all people and organizations physically in the United States, and all branches of U.S. organizations throughout the world." This should have alerted Mr. Soussi it was illegal for him, as a United States citizen, to

engage in transactions for the purpose of exporting goods to Libya, even if the goods were shipped through a third country.

In the alternative, Mr. Soussi argues "even if an objective reasonable person would have known the conduct is illegal from reading [the document], both [witnesses] said that Mr. Soussi did not study this document." Mr. Soussi claims because he did not have "subjective knowledge that his conduct was prohibited," the court should not have given a deliberate ignorance instruction.

Once again, we disagree with Mr. Soussi's conclusion. While the testimony supports Mr. Soussi's claim that he did not extensively study the document, this is unhelpful to Mr. Soussi. In fact, this is precisely the fact scenario in which a deliberate ignorance instruction should be given. There is evidence Mr. Soussi had subjective knowledge of his criminal behavior. He lied to United States manufacturers about the destination of the trailers. He asked manufacturers if they could remove markings showing the trailers were from the United States. He asked Dutchmen to issue an invoice to Oasis UK instead of Oasis Colorado. These evasive actions are evidence Mr. Soussi knew his actions were illegal. Yet, there is evidence suggesting Mr. Soussi deliberately refused to read the document on the Libyan export ban, presumably because he wanted to

avoid unequivocal knowledge it was illegal for him to engage in the transaction even if he was purporting to act on behalf of Oasis UK.[7]  Therefore, we affirm the district court's decision to give the deliberate ignorance instruction.

## VI.    Motion for New Trial

Lastly, Mr. Soussi argues the district court erred in denying his motion for a new trial because the district court erroneously admitted hearsay statements.

Mr. Soussi's motion for a new trial was based on the admission of out-of-court statements by Marino Torti, Mosadak Soussi, and Chris Russotto.  Mr. Soussi did not raise hearsay objections to the statements when the government introduced them at trial.  However, in his motion for a new trial, Mr. Soussi argued these statements were admitted because he was originally charged with the substantive offense involved in this appeal as well as conspiracy to commit the

---

[7] Mr. Soussi protests, claiming it is unfair to fault him for failing to study the document when "[h]e was shown this document in the context of a business discussion about restaurants in the Middle East that had nothing to do with exporting to Libya."  His argument, however, is undercut by the record in this case.  One of Mr. Soussi's business associates testified that his notes listed "Mobile housing for Libya - ongoing" as one of the topics of discussion at a meeting with Mr. Soussi held about two months before he gave Mr. Soussi the document about the Libyan trade restrictions.  We conclude the evidence was sufficient for the district court to give the deliberate ignorance instruction.

-29-

substantive offense. He suggested he did not object to the hearsay material because he thought the material would be admitted pursuant to the co-conspirator exception to the hearsay rule. After the government's case-in-chief, the district court dismissed the conspiracy count because "the Government had not produced sufficient evidence to demonstrate that Mosadak Soussi ... and Marino Torti – the only alleged conspirators, aside from the defendant – possessed the intent required to commit the underlying offense." Consequently, Mr. Soussi argued it was error to admit the out-of-court statements when the government did not prove a conspiracy. The district court denied the motion for a new trial in part because it did "not believe the receipt of the statements and documents was plain error .... The testimony cut both ways – that is, it could favor both the defendant and the Government."

On appeal, Mr. Soussi acknowledges much of the hearsay evidence introduced by the government was helpful to his case.[8] Consequently, Mr. Soussi complains only about the admission of two exhibits introduced through Mr. Torti's testimony, which he contends contain hearsay material.[9] The first is a

---

[8] For example, as we discussed in Part IV, Mr. Soussi relies on Mr. Torti's hearsay statements to support his argument the district court should have given a "come to rest" instruction.

[9] We note Mr. Soussi did not identify the two allegedly damaging exhibits until his reply brief. Mr. Soussi's specific objection to these exhibits is much like

telefax message from Marino Torti to Mosadak Soussi that stated: "Talking about the 'certificate of origin' I have a big surprise for you: prepare yourself to offer me a fish drama in a top quality restaurant !!! You'll see the solution in the next coming fax message." Mr. Torti testified this referred to his attempts to obtain a certificate of origin stating the trailers came from the United Kingdom. Mr. Torti said he was never able to obtain the certificate because the goods were never imported into the United Kingdom and no taxes were paid to the United Kingdom. The second exhibit is also a telefax message from Mr. Torti to Mosadak Soussi. It contains an list of services Mr. Torti provided. One item listed is "Special and confidential agreement with Customs authority for the necessary arrangements, in order to induce a Customs officer to close not two but two thousand eyes at the time of the transhipment. This must be paid but there is not the possibility to get a receipt." According to Mr. Torti, the document was sent in response to Mosadak Soussi's concern Italian Customs would discover the origin of the goods. Mr. Torti testified he told Mosadak Soussi "since the goods were ... now in the ownership of a U.K. subject, the U.K. subject could decide to send the goods where he wished." Mr. Torti maintained he did not ask Customs officers to

---

any argument raised for the first time in a reply brief – it denied the government the opportunity to respond to the argument and deprived us of adequate briefing. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). While we find this practice troubling, in this instance we exercise our discretion and address Mr. Soussi's argument.

-31-

do anything improper.

We review the denial of a motion for a new trial for abuse of discretion. *United States v. McKneely*, 69 F.3d 1067, 1073 (10th Cir. 1995). A district court abuses its discretion if it makes an error of law. *United States v. Hardman*, 297 F.3d 1116, 1120 (10th Cir. 2002). Here, the alleged error of law is the district court's admission of the exhibits. Consequently, we will affirm the district court's denial of the motion for a new trial unless the district court erred in admitting the exhibits. In this instance, we review the admission of the exhibits only for plain error, as Mr. Soussi did not raise a hearsay objection at trial. *See United States v. Martinez*, 76 F.3d 1145, 1150 (10th Cir. 1996). Under this standard, we reverse a district court, *inter alia*, "only if we determine that admitting the [exhibits] placed the underlying fairness of the entire trial in doubt or affected [Mr. Soussi's] substantial rights." *United States v. Fuentez*, 231 F.3d 700, 708 (10th Cir. 2000) (quotation marks and citation omitted). Mr. Soussi bears the burden of persuading us any error affected his substantial rights. *United States. v. Olano*, 507 U.S. 725, 734 (1993). In this case, the court's admission of the hearsay testimony was not plain error, and the district court did not abuse its discretion in denying the motion for a new trial.

Throughout this opinion, we have emphasized the great weight of evidence against Mr. Soussi. We have done this without referring to either of the two exhibits Mr. Soussi now claims were erroneously admitted. In contrast, Mr. Soussi's defense was weak. It consisted almost solely of arguing Mr. Soussi did not know he was violating the law by helping his brother's foreign company export the trailers to Libya.

Nevertheless, our inquiry is not whether there was enough evidence to convict Mr. Soussi without the two exhibits, but whether admission of the evidence placed the underlying fairness of the trial in doubt or affected Mr. Soussi's substantial rights. *See Fuentes*, 231 F.3d at 708. Mr. Soussi contends the exhibits affected the fairness of his trial because "after thrice telling the court it was hopelessly deadlocked, and after an hour of reviewing [Mr. Torti's] deposition and exhibits, the jury returned with a guilty verdict."[10]

We disagree with Mr. Soussi for three reasons. First, Mr. Torti's deposition and the accompanying exhibit are lengthy, consisting of more than one

_____

[10] Although Mr. Soussi now contends Mr. Torti's testimony and the accompanying exhibits caused the jury to return a guilty verdict, Mr. Soussi was unequivocally in favor of the district judge giving these items to the jury for review.

hundred pages. It is difficult for us to believe the two paragraphs Mr. Soussi now complains of were the deciding factors in the jury's verdict. Second, the exhibits were not necessarily inconsistent with Mr. Soussi's defense. While the exhibits suggest Mosadak Soussi and Mr. Torti suspected it was illegal to ship the trailers to Libya, the documents do not connect Fikri Soussi to the trailers. Mr. Torti testified, prior to the detention of the trailers, he dealt only with Mosadak Soussi. This evidence supported Fikri Soussi's contention he had not done anything wrong because a foreign corporation exported the trailers. Furthermore, Mr. Torti was given ample opportunity to explain that Mosadak Soussi was concerned about the legality of shipping the trailers to Libya and that the exhibits were his attempts to reassure Mosadak Soussi the shipment was completely legal because a foreign company was shipping the trailers. This testimony about the exhibits corroborated Fikri Soussi's theory that the average person would not have realized the conduct was against the law. Third, given the wealth of evidence offered by the government, we believe the two exhibits did not affect the verdict in this case. Consequently, we conclude it was not plain error for the district court to admit the two exhibits. The district court did not abuse its discretion in denying Mr. Soussi's motion for a new trial.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's decision and

**REMAND** the case for further proceedings consistent with this opinion.[11]

---

[11] The case must be remanded because Mr. Soussi was released on bond pending resolution of this appeal.