FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 12, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SAMMY JOE PERRYMAN,

    Defendant - Appellant.

No. 12-5203
(D.C. No. 4:11-CR-00100-CVE-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.

Sammy Joe Perryman appeals seven convictions related to the arson of his

business.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

Perryman owned and operated a health club known as Vintage Health Quest or the

Tulsa Athletic Club.  On January 22, 2006, the club was severely damaged by fire, the

cause of which was later determined to be arson.  Perryman was charged with eleven

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 32.1.

counts related to the fire. He went to trial on seven: Count One alleged that Perryman used fire to commit mail fraud in violation of 18 U.S.C. § 844(h)(1); Count Two alleged he destroyed a building affecting interstate commerce by means of fire in violation of 18 U.S.C. § 844(i); and Counts Three through Seven charged him with executing a scheme to defraud based on fraudulent insurance claims in violation of 18 U.S.C. § 1341.[1]

At trial, the government showed that the club had been losing money and that Perryman was in financial distress. Between 2003 and 2005, club revenues declined by forty-seven percent. A club employee estimated that membership had declined by seventy-five percent over roughly the same period. Several witnesses testified that the club and its facilities were in poor condition and needed significant maintenance. Defense witnesses, however, countered that the club was in good condition and that repair work had been completed around the time of the fire. Perryman had attempted to sell the property beginning in 2004, but was unable to find a buyer.

Because the club was losing money, Perryman used loans to cover operating expenses. The maturity date on a second mortgage on the property was extended in late 2005. Perryman owed approximately $122,000 on that loan, and missed the payment due in January 2006. In May 2005, he also obtained a $150,000 loan secured by a third

---

[1] Perryman pled guilty to one count of knowingly concealing property of his bankruptcy estate in violation of 18 U.S.C. § 152(1), and one count of engaging in a monetary transaction in criminally derived property through a financial institution affecting interstate commerce in violation of 18 U.S.C. § 1957(a). The government dismissed two other charges. These counts are not relevant to the current appeal.

mortgage. A balloon payment was due for that loan in May 2006.

Perryman experienced personal financial troubles as well. He filed for personal bankruptcy protection in 2005, listing over $400,000 in debts and just $800 in assets. His personal debt was discharged in the bankruptcy proceeding in August 2005, but Perryman moved to dismiss the case after the fire. He stated that pending insurance proceeds would be sufficient to pay off his debts. Perryman had carried a one million dollar insurance policy on the building, and additional coverage for business personal property and business income. His claim based on the fire, however, was denied by Hartford Insurance. Portions of Perryman's deposition from the insurance investigation were provided to the jury.

The prosecution introduced several pieces of evidence suggesting Perryman planned the fire. A tenant who rented the apartment above the club testified that Perryman asked him to stay elsewhere the night of the fire because Perryman was setting off bug bombs. Two employees testified that Perryman removed personal items, including paintings and Boy Scout medals, from the club a few weeks before the fire. Perryman's ex-wife, Shannon Olmos, however, testified that the paintings had been removed two months before the fire after the artist had passed away.

On the day of the fire, Olmos and Perryman, who had been a full-time firefighter for fifteen years, visited the club to set the insecticide devices. A receipt indicated that their vehicle passed a toll booth located about fifteen minutes from the club at 5:32 p.m. Olmos estimated the pair was at the club for about thirty minutes, during which time they

were in separate parts of the building. Perryman asked Olmos to wait in their vehicle while he finished up, which took five to ten minutes. Another receipt indicated that the couple stopped at a gas station located just a few minutes from the club at 6:14 p.m.

The fire was reported around midnight. Firefighters noted that one of the doors of the health club was standing open, but all of the other doors were locked. A fire investigator with the Bureau of Alcohol, Tobacco, Firearms, and Explosives testified that the fire started near the men's sauna and that it was deliberately set using gasoline. The agent noted that much of the building contained very little fuel for a fire. He explained that starting the fire near the sauna would make it difficult to detect because it was an interior portion of the building away from doors and windows. Another witness stated that the building was very large, roughly 30,000 to 40,000 square feet.

When he arrived at the scene of the fire, Perryman told investigators that he believed a former employee, Stace Proctor, had started the blaze. Perryman stated that Proctor was a long-time member who had recently been kicked out of the club for making inappropriate comments to a female employee, and claimed Proctor had sent him a threatening note. The woman referenced by Perryman testified that Proctor had made lewd comments toward her, and that he threatened her when he was ejected from the club. Two employees testified that Perryman blamed Proctor when he called to notify them of the fire. Proctor testified at trial. He denied making any threats and testified that he was not involved in the fire, although he admitted making inappropriate comments and conceded that he did not have a confirmable alibi for the night in question.

-4-

The jury returned a verdict of guilty on all seven counts. The district court imposed a total sentence of 180 months' imprisonment. Perryman timely appealed.

## II

Perryman argues that the district court abused its discretion by denying his motion for a new trial based on allegedly improper testimony. We review the denial of a motion for a new trial for abuse of discretion. See United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996). "A district court abuses its discretion if it makes an error of law." United States v. Soussi, 316 F.3d 1095, 1108 (10th Cir. 2002). Because Perryman did not contemporaneously object to the testimony forming the basis of his motion, "we will affirm the district court's denial of the motion for a new trial unless the district court erred in admitting" the challenged evidence. Id. at 1109. And we review the admission of the contested evidence only for plain error. Id. To prevail under the plain error standard, the appellant must show: "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Cotton, 535 U.S. 625, 631 (2002) (quotations, citation, and alterations omitted).

Perryman asserts that four segments of testimony were improperly admitted. An employee of the health club stated that Perryman "lost his temper a lot. He told us a lot, especially myself, that he could get a monkey to do my job." The same witness, when asked how she felt about Perryman, replied, "I don't like him. He was mean to people.

-5-

He was mean to his employees." A second club employee testified that Perryman asked to borrow money from him in 2003, and when he refused, Perryman reduced his pay by $100 per week even though his hours and rate of pay were unchanged. That employee further testified, "I don't have a lot of respect for [Perryman] any more [sic]." Proctor indicated that he avoided Perryman "because he just talked down to people." Finally, Olmos stated that Perryman "always had a pretty negative demeanor." She also responded to a question about the condition of her marriage in May 2005 by stating, "It was a very difficult marriage. It was full of a lot of emotional and mental and physical abuse."

Perryman argues that admission of this testimony violated Fed. R. Evid. 404(a)(1), which states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait," and that it violated Fed. R. Evid. 404(b)(1), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Perryman points to the government's closing argument, in which the prosecutor stated that the evidence showed Perryman "takes matters into his own hands, he doesn't tell the truth, he blames others, he manipulates people." The prosecutor further argued that Perryman "needed to be in control and dominate," traits that led him "to the place he is now." The prosecutor asked the jury to consider "how he treats other people," specifically referencing the pay-reduction story and Olmos' lack of control over the

couple's finances.

We are troubled by the prosecutor's decision to elicit the challenged testimony, and disappointed that an officer of the court would choose to emphasize it in closing. See generally United States v. Mikolon, 719 F.3d 1184, 1189 (10th Cir. 2013) (noting that prosecutors act as officers of the court). The force of the evidence against Perryman makes the government's decision to pursue this problematic line of argument all the more perplexing.

The government argues that it was merely drawing out potential biases of its witnesses preemptively. See United States v. Ewings, 936 F.2d 903, 909 (7th Cir. 1991) ("Minimizing the 'sting' of an opponent's impeachment by initiating the impeachment yourself is a time-honored trial tactic, . . . one practiced by prosecutor and defendant alike."). "Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest" and "[p]roof of bias is almost always relevant." United States v. Abel, 469 U.S. 45, 52 (1984). Although this rationale may explain the various witnesses' assertions that they disliked Perryman, it seems obvious that defense counsel would not have elicited testimony regarding Perryman's improper reduction of an employee's pay or spousal abuse. Nor does this theory account for the statements made in closing urging the jury to consider the type of person Perryman was.

Even if we assume that these statements rose to the level of plain error, however, we conclude that Perryman has not shown that his substantial rights were affected. "To satisfy the third prong of plain error review, the appellant must show a reasonable

-7-

probability that, but for the error claimed, the result of the proceeding would have been different." United States v. Cordery, 656 F.3d 1103, 1108 (10th Cir. 2011) (quotation omitted). Most of the challenged statements simply indicated that Perryman was a cruel and unethical boss. Olmos' claim that her marriage with Perryman included physical abuse is more problematic, but the "prosecutor did not unduly emphasize" it. United States v. Dean, 76 F.3d 329, 335 (10th Cir. 1996). Given the strength of the case against Perryman, we do not discern a reasonable probability that the result of trial would have been different absent the allegedly improper testimony and closing argument.

**III**

Perryman also argues that the evidence was insufficient to convict him. In reviewing such claims, we "must consider, in a light most favorable to the Government, all direct and circumstantial evidence and the inferences that may reasonably be drawn from that evidence." United States v. Bishop, 890 F.2d 212, 219 (10th Cir. 1989) (quotation omitted). The dispositive question is whether "a reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Hooks, 780 F.2d 1526, 1531 (10th Cir. 1986) (emphasis omitted).

Perryman argues that the government's theory of the case was facially implausible. He contends a jury could not rationally conclude that he started the fire around 6 p.m. but that it was not reported for nearly six hours, given common knowledge that gasoline is extremely flammable. He also relies on the fact that Olmos did not report he smelled of gasoline after leaving the club on the night of the fire, and argues that an

-8-

arsonist would not have stopped at a convenience store near the fire.

We reject Perryman's arguments. The government's expert provided testimony from which a reasonable jury could conclude that the fire went undetected for a lengthy period of time:  much of the building contained little flammable material and the fire was set in an interior portion of the structure, which was very large. He also noted that although gasoline burns readily, a gas fire will extinguish quickly unless other materials catch. That Olmos did not notice the smell of gasoline and that the couple stopped at a nearby store do not compel a verdict of acquittal.

Moreover, we have previously held that arson may be proved by circumstantial evidence alone. See United States v. Grimes, 967 F.2d 1468, 1470 (10th Cir. 1992). And the government's circumstantial case was extremely powerful. Perryman was facing severe financial problems, but insurance proceeds would have satisfied his debts. He removed personal keepsakes shortly before the arson. He arranged to have a tenant of the building stay elsewhere the night of the fire. And he was the last known person in the club before the fire started. Viewed in the light most favorable to the government, this evidence was sufficient to support the jury's verdict.

## IV

**AFFIRMED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge