**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff-Appellee,<br><br>v.<br><br>JERRY L. LOVERN,<br><br>      Defendant-Appellant. | No. 08-3141 |
| UNITED STATES OF AMERICA,<br><br>      Plaintiff-Appellee,<br><br>v.<br><br>ROBERT J. BARRON,<br><br>      Defendant-Appellant. | No. 08-3149 |

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 07-CR-10079-02-WEB; 07-CR-10079-04-WEB)**

---

Lee Thompson, Thompson Law Firm, LLC, Wichita, Kansas, for Defendant-Appellant Jerry L. Lovern.

Timothy J. Henry, Assistant Federal Public Defender, Wichita, Kansas, for Defendant-Appellant Robert J. Barron.

Mona Lee M. Furst, Assistant United States Attorney (Marietta Parker, Acting United States Attorney, with her on the briefs), for Plaintiff-Appellee United States in Case Nos. 08-3141, 08-3149.

---

Before **TACHA, O'BRIEN,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

The principal owner-operator of Red Mesa Pharmacy pled guilty to conspiracy to dispense drugs in violation of the Controlled Substances Act. Meanwhile, two of his employees went to trial on similar charges and now appeal their resulting convictions. The trial record tells very different stories about the two men and their roles in the pharmacy's operations. The first, Jerry Lovern, is a pharmacist with almost forty-five years' experience. The record strongly suggests that he well knew details of the pharmacy's illicit operation, and we affirm his convictions. By contrast, Robert Barron, a high school drop-out with no experience in the medical or pharmaceutical fields, served as the pharmacy's computer technician. There is no evidence that he knew Red Mesa's managers and pharmacists filled prescriptions issued without a legitimate medical purpose or in defiance of professional standards. Accordingly, we are obliged to reverse his convictions.

I

A

Nothing about Wilbur and Margaret Hilst's foray into the pharmacy business was conventional. They opened their pharmacy, Red Mesa, in Wichita, Kansas, in the Fall of 2005 by submitting false information in their license applications to the Kansas Board of Pharmacy and the federal Drug Enforcement Administration (DEA). They then pursued a business plan that involved securing customers exclusively through websites run by two companies, SafeTrust Processing and IntegraRx, based respectively in Costa Rica and Seattle, Washington.

Through these web-based businesses, customers across the nation received prescription drugs simply by filling out an online questionnaire. Physicians in the United States and Puerto Rico contracted with SafeTrust and IntegraRx to log into their websites, review customer questionnaires, and either approve or disapprove the customers' requested prescriptions. Physicians did not examine their putative patients; they did not verify any of the personal information provided in the questionnaires; in fact, they did not have any dealings at all with the subjects of their prescriptions. Yet, the doctors approved the vast majority of the requested prescriptions. SafeTrust and IntegraRx took these approved prescriptions and placed them online for access by participating pharmacies, including Red Mesa, to fill and ship. Customers paid for all this by credit card through the two websites;

-3-

in turn, SafeTrust and IntegraRx shared with Red Mesa $7.00 for each order filled, in addition to paying for the wholesale cost of the drugs. In all, Red Mesa received $703,611.00 during its eight months of operation.

For a few months, Red Mesa carried a certificate from the DEA permitting it to distribute substances subject to the Controlled Substances Act (CSA). *See* 21 U.S.C. §§ 801 *et seq.* During this period, Red Mesa filled more prescriptions for controlled substance (a total of 9,256) than noncontrolled ones – this in contrast to standard pharmacies, where the breakdown favors noncontrolled substances by a factor of nine to one. The controlled substances Red Mesa distributed consisted largely of diet and sleep aid pills, while the noncontrolled drugs it specialized in included so-called "lifestyle drugs" (Viagra and the like), as well as some pain medications.

Mr. Hilst ran Red Mesa's operations. He opened the pharmacy in November 2005 and was responsible for managing the inventory and choosing which prescriptions the pharmacy filled. His wife served as the pharmacy's day-to-day operations manager while Mr. Barron worked as a computer technician, printing out labels for prescriptions that Mr. Lovern, the principal pharmacist, then filled.

Red Mesa was not open for long before authorities grew curious. Their first clue came from Maxine Ihrig, Red Mesa's original pharmacist, who became apprehensive when she saw that the pharmacy filled prescriptions issued by

doctors who didn't reside in the same states as their patients. She expressed her discomfort to LaTonyua Rice, a pharmacist and inspector with the State Board of Pharmacy, in November 2005. In turn, Ms. Rice reported all this to the Board and to Patricia O'Malley, a DEA investigator. The State did not immediately revoke Red Mesa's license, but in February 2006 Ms. Rice visited the pharmacy and issued a number of citations. Among these, she cited the pharmacy for violating a Kansas law limiting customers to a 30-day supply of diet pills at any one time. The DEA conducted its own investigation and executed a search warrant in March 2006. After the search, Mr. Hilst surrendered the pharmacy's DEA federal controlled substance registration. While that left Red Mesa no longer able lawfully to fill prescriptions for controlled substances – and it didn't – the pharmacy did continue to distribute noncontrolled prescription substances until June 2006, when its state license was also revoked, forcing the pharmacy to shutter.

B

Eventually, the federal government brought charges against the Hilsts, as well as Mr. Lovern and Mr. Barron, alleging violations of the CSA. "Enacted in 1970 with the main objectives of combating drug abuse and controlling the legitimate and illegitimate traffic in controlled substances, the CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in

any of the Act's five schedules." *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006). Section 841(a)(1) makes it unlawful, except under circumstances authorized by the statute, "for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

In one prominent and, for our purposes, pertinent exception, the CSA allows registered practitioners to issue prescriptions for controlled substances classified in four of the five schedules. *See* 21 U.S.C. § 829. At the same time, however, implementing regulations require that these prescriptions must "be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). While the responsibility for meeting this test rests in the first instance with the prescribing doctor, "a corresponding responsibility rests with the pharmacist who fills the prescription." *Id.* Accordingly, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.*

Mr. Hilst pled guilty to conspiracy under the CSA, and the charges against Mrs. Hilst were dismissed. This appeal, meanwhile, arises from the joint trial of

Mr. Lovern and Mr. Barron, each of whom was charged with and convicted of one count of conspiracy to distribute controlled substances in contravention of § 841(a)(1), and three substantive counts of distribution of controlled substances in violation of § 841(a)(1) and 18 U.S.C. § 2 (aiding and abetting). We begin with Mr. Lovern's appeal before addressing Mr. Barron's.

II

Mr. Lovern seeks reversal of his convictions for five primary reasons. He argues that they run afoul of the CSA's terms and Supreme Court's teachings in *Gonzales v. Oregon*; that insufficient evidence exists, as a matter of law, to support the jury's verdict; that the district court erred in refusing to accept his expert witness; that § 841(a) is unconstitutionally vague as applied to him; and that the court erred by declining to give an instruction to the jury on an entrapment by estoppel defense. None of these arguments, however, warrants reversal.

A

Mr. Lovern begins by asserting that "[t]here was no evidence [at trial] and there is no law that a prescription received via the [I]nternet is illegal." Aplt. Br. at 14. But this is a red herring: the government has disclaimed any interest in trying to prove that using the Internet to transmit a lawful prescription is unlawful under the CSA. Rather, to show that Mr. Lovern violated the CSA, the government has argued before us that the issuance of a prescription based solely

-7-

on an online questionnaire, without anything more – without any existing doctor-patient relationship, without a physical exam, without any confirmation of the questionnaire's contents, without any further contact of any sort – falls outside the usual course of contemporary medical practice.  And, the government contends, Mr. Lovern knew this is exactly how IntegraRx and SafeTrust physicians operated, yet he still filled their prescriptions for controlled substances.  It is this theory of CSA liability that the government has pursued against Mr. Lovern, and that Mr. Lovern must address to avoid his conviction.

Seeking to do so, Mr. Lovern replies that, under *Gonzales v. Oregon*, the federal government has no business trying to define what practices are and are not within the usual course of professional medical practice.  In *Gonzales*, the Attorney General issued an Interpretive Rule prohibiting the dispensation of controlled substances for use in physician-assisted suicide after adjudging assisting a suicide not to be a "legitimate medical purpose."  The Attorney General's judgment on this score, of course, conflicted with the view of at least one state (Oregon) that permitted the practice at the time.  The Supreme Court struck down the Interpretive Rule on the basis that it exceeded the Attorney General's delegated authority under the CSA.  546 U.S. at 267.

*Gonzales* does not apply to our case.  Unlike *Gonzales*, we have before us no interpretive rule seeking to define a practice as lacking any legitimate medical purpose, let alone a rule that conflicts with a state's assessment of the legitimacy

-8-

of that practice. Instead, in this case the government sought to establish that the conduct of the SafeTrust and IntegraRx physicians was inconsistent with the usual course of professional practice the old-fashioned way: through witnesses and documentary proof at trial focused on the contemporary norms of the medical profession. Unlike *Gonzales* as well, Mr. Lovern wasn't foreclosed by rule from disagreeing; instead, he was free at all times to present contrary proof that his behavior and those of the SafeTrust and IntegraRx prescribing physicians *were* consistent with the usual course of professional practice. And, again unlike *Gonzales*, the jury here remained free to sort out all the competing proof: the question what constitutes usual medical practice remained, at all times, within its province, not the Attorney General's. *See* Jury Ins. Nos. 24, 26 (instructing on elements of conspiracy and distribution, one being that controlled substance was distributed "outside the usual course of professional medical practice or without a legitimate medical purpose"). In this case, then, "[t]he government [made] no attempt, as in *Gonzales*, to unilaterally define which practices fall outside th[e] scope [of professional practice]; rather, it intend[ed] to leave that question where it has been for over 30 years – with the jury." *United States v. Quinones*, 536 F. Supp. 2d 267, 271 (E.D.N.Y. 2008).

                                                    B

Even if the government's case did not run afoul of *Gonzales*, Mr. Lovern maintains the government presented insufficient evidence at trial to support its

claim that prescriptions based solely on a completed online questionnaire, without more, are inconsistent with the usual course of contemporary medical practice. We cannot agree. Whatever may be the case in five or ten or twenty years, the government adduced sufficient proof at trial that the practices of SafeTrust and IntegraRx physicians were not within the usual course of professional practice as of 2005 and 2006.

The proof came in part from Mr. Lovern himself. A pharmacist with almost forty-five years of experience, Mr. Lovern took the stand and admitted that a prescription "issued by a prescriber acting within the course of legitimate professional practice" will be one for which "the prescriber was prescribing for a patient which he might normally have seen in his office, whether he saw him in the office or not, or elsewhere." Aplt. App. at 1213; 1236-37. Adding to Mr. Lovern's testimony were several other witnesses who testified about contemporary medical practices. They included Deborah Billingsley, the executive secretary of the Kansas Board of Pharmacy; Ms. Rice, a pharmacist and inspector with the Board; Ms. Ihrig, one of Red Mesa's first pharmacists; and Ms. O'Malley, an investigator with the DEA. These witnesses also pointed to directives from groups like the American Medical Association and the Federation of Medical Boards, each of which expressed the view that a physician issuing a prescription based solely on an online questionnaire does not meet appropriate medical standards of care, as well as to a DEA Diversion Control Notice from

-10-

2001 summarizing the views of various state and professional societies and reaching the same conclusion.[1]

From such varied sources – as well as from their common experiences – a reasonable jury could determine that issuing prescriptions for controlled substances based solely on online questionnaires fell outside the usual course of medical conduct, at least at the time of trial. Neither is the jury's conclusion a novel one. *See, e.g.*, *United States v. Nelson*, 383 F.3d 1227, 1228-30 (10th Cir. 2004) (upholding conviction of physician under CSA where he approved 90-95% of requests for prescriptions submitted over Internet website, without conducting physical examination); *United States v. McIver*, 470 F.3d 550, 563-64 (4th Cir. 2006) (physician exceeded the legitimate practice of medicine when he prescribed controlled substances despite conducting little or no diagnostic tests on his patients); *United States v. Fuchs*, 467 F.3d 889, 908-09 (5th Cir. 2006) (finding sufficient evidence showed prescriptions were outside usual course of medical practice where prescriptions were initiated by orders sent to pharmacy through its website; customers were located throughout United States; pharmacy forwarded

---

[1] Reviving his *Gonzales* argument, Mr. Lovern challenges the admission of the DEA Notice and testimony based on it. We see no abuse of discretion in their admission. Here, again, the Attorney General did not profess the ability to deem a practice out-of-bounds by rule, but left the question to the jury, with both sides free to present competing proof on what is and is not within the usual course of professional practice. Unlike the rule at issue in *Gonzales*, the DEA Notice was treated here as but one piece of proof, not as an effort to foreclose the need for proof at a trial.

prescription forms to physicians for approval; physicians were paid per prescription; pharmacy's prices were higher than average; and pharmacy did not accept insurance).

Mr. Lovern complains that neither of the two pharmacists who testified, Ms. Rice and Ms. Ihrig, nor the DEA investigator, Ms. O'Malley, is a physician. From this, we gather that Mr. Lovern believes only doctors can testify about usual practices in the profession. But he provides no legal support for this notion, and in the case of pharmacists, the regulations implementing the CSA tend to refute his hypothesis. Those regulations expressly place a duty on pharmacists not to knowingly fill prescriptions issued outside the usual course of medical practice. *See* 21 C.F.R. § 1306.04(a). Given this legal duty, it does not strain the imagination to think that some pharmacists might know and be qualified to speak about what it means for a prescription to be consistent or inconsistent with the usual course of medical practice. Indeed, even Mr. Lovern himself offered testimony on exactly these lines, and he certainly doesn't suggest his own testimony was inadmissible. This is not to say that all pharmacists are necessarily qualified to testify about the usual course of medical practice. But it is to say, contrary to Mr. Lovern's view, that pharmacists are not categorically incapable of offering such testimony. *See also United States v. Perry*, 1991 WL 147466, at *2 (6th Cir. 1991) (per curiam) (unpublished) (holding that pharmacist's testimony as to unusual activities at pharmacy in CSA prosecution are "precisely within the

-12-

realm of permissible expert testimony allowable under Fed. R. Evid. 702").

Neither was it an abuse of discretion for the district court to admit the testimony of Ms. O'Malley, a DEA diversion investigator with over fifteen years of experience. In cases prosecuting the trafficking of common street drugs under the CSA, courts have routinely upheld the admission of expert testimony from law enforcement officers seeking to identify for the jury typical indicia of drug trafficking activity. *See, e.g.*, *United States v. Becker*, 230 F.3d 1224, 1231 (10th Cir. 2000); *United States v. Sturmoski*, 971 F.2d 452, 459 (10th Cir. 1992). Ms. O'Malley's testimony sought to do much the same in this case: to identify for the jury common red flags suggestive of an illicit pharmaceutical operation. We are given no reason to think such testimony is unhelpful or irrelevant or otherwise improper simply because this case arose in the context of pharmaceutical rather than street drugs, and we note that other circuits have permitted testimony like Ms. O'Malley's. *See, e.g.*, *United States v. Seelig*, 622 F.2d 207, 213-14 (6th Cir. 1980), *cert. denied*, 449 U.S. 869 (1980); *Perry*, 1991 WL 147466 at *2.

## C

Mr. Lovern next objects to the district court's exclusion of his expert witness, John Mudri. According to Mr. Lovern, Mr. Mudri was prepared to testify on "what factors a pharmacist acting under the standards of his profession could reasonably rely upon in determining the legitimacy of prescriptions." Aplt. App. at 121. The district court granted the government's motion to exclude Mr.

-13-

Mudri, holding that he was unqualified to offer expert testimony on this subject. Before us, Mr. Lovern seeks to contest the exclusion of Mr. Mudri, but the government rightly notes that Mr. Lovern waived any right to object to do so when he expressly took the position before the district court that, as an expert, "Mr. Mudri *is not qualified* but is able to testify as . . . a fact witness as to certain points which may come up" during testimony by another witness. *Id.* at 891 (emphasis added). *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted); *United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006), *cert. denied*, 549 U.S. 911 (2006) ("[A] party that has waived a right is not entitled to appellate relief."). Even if we could overlook this problem, we would still face another: The district court's exclusion rested on Mr. Mudri's lack of sufficient qualifications, yet, in his opening brief on appeal, Mr. Lovern argues merely that Mr. Mudri's testimony would have been *relevant* to the case. Mr. Lovern does not address the basis of the district court's exclusion order, let alone establish that its assessment of Mr. Mudri's qualifications represents an abuse of discretion.[2]

---

[2] In his reply brief, Mr. Lovern asserts that the district court erred by "bas[ing] its ruling primarily on Defendant's Rule 16 disclosure" instead of granting his request for a *Daubert* hearing. Aplt. Reply Br. at 3. Mr. Lovern did not raise this issue in his opening brief, nor in his motions for a new trial or judgment of acquittal, and thus we decline to pass on it. *See United States v.*

(continued...)

D

Next, Mr. Lovern takes aim at the CSA itself, arguing that § 841(a)(1) is unconstitutionally vague as applied to him. Elemental to our concept of due process is the assurance that criminal laws must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," and those that fail this test are treated as no laws at all: they are "void for vagueness." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979) (internal quotation marks omitted). Ours is not a legal system like Caligula's, "who reportedly 'wrote his laws in a very small character, and hung them up upon high pillars, the more effectually to ensnare the people.'" *Flores-Figueroa v. United States*, 129 S. Ct. 1886, 1895 (2009) (Scalia, J., concurring in part and concurring in the judgment) (quoting 1 W. Blackstone, Commentaries on the Laws of England 46 (1765)).

As applied to Mr. Lovern, the CSA cannot be said to fall prey to such due process concerns. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 7 (1982) ("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand.") (alteration in original). The evidence produced at trial "demonstrate[d] that [Mr. Lovern] had knowledge of the illegality of his

----

[2](...continued)
*Martinez*, 518 F.3d 763, 767 n.2 (10th Cir. 2008).

-15-

activities, and thus this is not a situation where he 'could not reasonably understand that his contemplated conduct is proscribed.'" *United States v. Day*, 223 F.3d 1225, 1229 (10th Cir. 2000) (quoting *Parker v. Levy*, 417 U.S. 733, 757 (1974)); *see also United States v. El-Hajjaoui*, 227 F.3d 1274, 1277 (10th Cir. 2000). Mr. Lovern was a pharmacist with decades of experience. According to his own testimony, Mr. Lovern understood that he had a legal duty to ensure he filled only those prescriptions issued in the usual course of medical practice. He understood as well that a patient-physician relationship, including a physical examination, usually precedes a prescription in contemporary medical practice. And he knew that the prescriptions he filled at Red Mesa were issued after a customer filled in an online questionnaire with no follow-up physical examination or consultation with a physician. A reasonable jury could find that Mr. Lovern knowingly filled prescriptions issued outside the usual course of medical practice, something Mr. Lovern admitted he could not do lawfully. On this record, we cannot say that Mr. Lovern was the unwitting victim of a law he didn't understand.[3]

---

[3] As opinions from our sister circuits make clear, other bases for rejecting Mr. Lovern's vagueness challenges may exist, but we have no need to reach them on this record. *See United States v. Hassan*, 542 F.3d 968, 978-80 (2d Cir. 2008), *abrogated in part on other grounds by United States v. Hassan*, --- F.3d ----, 2008 WL 6714873 (2d Cir. Sept. 19, 2008); *United States v. DeBoer*, 966 F.2d 1066, 1069 (6th Cir. 1992); *United States v. Rosenberg*, 515 F.2d 190, 197-98 (9th Cir. 1975); *United States v. Collier*, 478 F.2d 268, 270-72 (5th Cir. 1973).

E

Finally, Mr. Lovern contends that he was entrapped. Among other things, Mr. Lovern points to the pharmacy's DEA license and suggests this meant the government approved its conduct. Mr. Lovern also points out that government agents visiting the pharmacy as part of their investigations never warned him that the pharmacy was running afoul of the law. Given all this, Mr. Lovern submits, the government should have been estopped from pursuing him for violating the CSA, and the district court erred when it declined to provide him an entrapment by estoppel jury instruction.

No such error took place here. Entrapment by estoppel claims against the government work only when "the government affirmatively misleads a party as to the state of the law and that party proceeds to act on the misrepresentation so that criminal prosecution of the actor implicates due process concerns." *United States v. Apperson*, 441 F.3d 1162, 1204 (10th Cir. 2006); *see also Wade Pediatrics v. Dep't of Health & Human Servs.*, 567 F.3d 1202, 1207 (10th Cir. 2009). A government license does nothing of this sort. It may allow a pharmacy to conduct business, but it does not absolve a pharmacist from his responsibility to avoid knowingly filling unlawful prescriptions. Likewise, government agents are allowed to investigate potential crimes without bearing an affirmative obligation to sit down and advise their targets about the lawfulness or unlawfulness of their activities. *See Wade Pediatrics*, 567 F.3d at 1207 ("Silence, of course, does not

-17-

rise . . . to the level of 'affirmative misconduct' required to warrant estoppel against the government.").

## III

Mr. Barron's conviction tells a different story. The theories of liability under the CSA the government pursued in its indictment and at trial required it to show that Mr. Lovern and Mr. Barron *knew* the prescriptions they helped fill at Red Mesa were issued by IntegraRx or SafeTrust physicians acting outside the usual course of professional medical practice or with a legitimate medical purpose. *See* Jury Ins. Nos. 24, 26, 27. But the government's proof, while it showed many things, failed to include direct or circumstantial evidence that Mr. Barron possessed this particular *mens rea*.

To be sure, Mr. Barron faces a high hurdle when seeking relief for lack of sufficient evidence to sustain his convictions: we review the evidence, as well as all reasonable inferences that they sustain, in the light most favorable to the jury's verdict, and we will only find the evidence insufficient if no reasonable jury could have found Mr. Barron guilty beyond a reasonable doubt. *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007). Even mindful of this demanding standard, however, we cannot help but reverse.

## A

There is no direct evidence that Mr. Barron knew that the prescriptions he helped distribute were issued outside the usual course of professional practice or

-18-

without a legitimate medical purpose. In fact, there is no direct evidence that Mr. Barron even knew the prescriptions at issue were based solely on online questionnaires, with a "patient" requesting and usually receiving a drug without any interaction with a doctor, let alone that doing so would be inconsistent with usual medical practices or purposes.

Instead, trial evidence suggested that "rogue" pharmacies like Red Mesa often "use persons with limited or no knowledge of medications and standard pharmacy practices and discretion" to facilitate their work, Aplt. App. at 1110, and that Mr. Barron met this description. Unlike Mr. Lovern, Mr. Barron was no pharmacist, and there was no evidence he had any prior experience in pharmacies, or that he had any sort of a medical education. To the contrary, the evidence at trial showed that the only training Mr. Barron received for his job was a fifteen-minute phone call with SafeTrust and IntegraRx representatives about how to access and set up accounts for the websites. A government agent who interviewed Mr. Barron in March 2006 testified that Mr. Barron appeared to have little knowledge of pharmaceuticals. A probation report prepared for sentencing revealed that Mr. Barron had completed only the 9th grade, due in part to a learning disability, and had a grade point average of 0.53 (between D and F).

Trial evidence also showed that Mr. Barron performed only menial computer tasks at Red Mesa. Mr. Barron's job was merely to log into the SafeTrust and IntegraRx websites, access a page that listed what prescriptions

-19-

were available, check a box next to those prescriptions the pharmacy would fill, and print labels for the chosen prescriptions.[4] He did not interact with customers; he did not see patient profiles; he did not communicate with SafeTrust or IntegraRx doctors; he did not even pick which particular prescriptions the pharmacy filled – Mr. Hilst sat by him and directed him on which boxes to check. Neither did Mr. Barron go about the business of filling the prescriptions – that was left to Mr. Lovern and other pharmacists.

B

Without direct evidence that Mr. Barron possessed the *mens rea* necessary to sustain a conviction under the CSA, the government seeks to rely on inferential proof. This, of course, is entirely appropriate: proof of *mens rea*, of what lies inside the recesses of the defendant's mind, very often must depend on circumstantial, rather than direct, evidence. The problem is that the proof on

---

[4] This account was confirmed by three government witnesses: Agent Bridgiers (who interviewed Mr. Barron in March 2006), Ms. O'Malley, and Ms. Rice. We note that at one moment in the record, Agent Bridgiers's testimony suggested Mr. Barron might have had more knowledge: the Agent testified in reference to an exhibit that "[t]his is actually the order that a customer used and this is actually in the back-end system where Mr. Barron would – either he could review the questionnaire that the customer filled out to determine the actual order that they placed or the pharmaceutical and then he could either approve or disapprove the shipping pharmaceuticals." Aplt. App. at 255. However, Agent Bridgiers's further testimony about the exhibit suggests he was referring not to what Mr. Barron saw on the two websites, but rather to customer orders that were provided by SafeTrust and IntegraRx. *See id.* at 255-56. Indeed, Agent Bridgiers later clarified, when probed on the subject, that all Mr. Barron accessed on the websites was a screen listing prescriptions. *Id.* at 278, 280-81.

-20-

which the government depends in this particular case fails to yield the *mens rea* inference required to convict Mr. Barron under the CSA theory the government pursued, even if it might suffice to yield a conviction under some other state or federal law.

1

The government first directs us to evidence that Mr. Barron knew that the pharmacy's prescriptions came exclusively from the Internet; that he told a government agent who interviewed him in March 2006 that the State Board of Pharmacy "didn't like Internet pharmacies"; that his wife, who had worked in a hospital as a surgery technician, told Mr. Barron that she didn't think Red Mesa could fill Internet orders; and that Mr. Hilst filled almost all prescriptions appearing on the websites.

Such facts could well support the inference that Mr. Barron thought Red Mesa was acting unlawfully in accepting prescriptions over the Internet. But (again) the government has disclaimed any interest in pursuing such a theory: "[u]sing the Internet to transmit a lawful prescription is not the issue" it tells us. *See* Appellee Br. (Lovern) at 28; *see also* Aplt. App. at 1118-19 (DEA investigator testifying that crux of investigation was unlawful distribution of prescriptions, and that "[w]hether that ended up being [by] Internet, or some other form, was not the crux"). Missing is any apparent link between the facts the government relies upon and the theory it pursued at trial: that Mr. Barron *knew*

-21-

the prescriptions Red Mesa filled were issued by IntegraRx and SafeTrust doctors, acting outside the usual course of professional medical practice or without a legitimate medical purpose. The government's facts, for example, don't even support the inference that Mr. Barron knew that physicians at SafeTrust and IntegraRx relied exclusively on online questionnaires to issue prescriptions – and they certainly don't support the inference that Mr. Barron knew that doing so exceeds the boundaries of legitimate practices and purposes in the medical profession.

The government falls into much the same trap when it points to the fact that Mr. Barron never registered as a pharmacy technician with the State, despite being told by a receptionist at the State Board that he needed to do so, as well as when it notes that one of Red Mesa's early pharmacists told Mr. Barron that there was a problem between the Kansas State Board of Pharmacy and Red Mesa (the record doesn't show Mr. Barron is told what that problem might be). Such evidence may well suggest that Mr. Barron knew *something* was amiss at Red Mesa, and perhaps more specifically that he was violating a state pharmacy technician registration law. But this evidence fails to suggest that Mr. Barron knew that SafeTrust and IntegraRx physicians issued prescriptions outside the usual course of professional practice or without a legitimate medical purpose. Without some evidence supporting *that* inference, Mr. Barron's conviction under the CSA cannot stand, even if a conviction for violating some other law might.

The government next points to a variety of instant message conversations between Mr. Barron and Mr. Heredia, who ran the SafeTrust website from Costa Rica. In one conversation, Mr. Barron referred to a prescription for diet pills (phentermine) in excess of a 30-day supply as "very illegal." Aplt. App. at 816. But the trial evidence revealed that, by this time, Mr. Barron had been told that prescriptions exceeding 30 days violated state law, and that the pharmacy had been cited for filling overlong prescriptions and so had ceased issuing them. At most, then, this conversation shows that Mr. Barron knew the length of a lawful diet pill prescription under state law, and complied with the law when he became aware of it. It does not suggest that Mr. Barron knew anything about the medical practices or purposes of physicians who issued the prescriptions Red Mesa filled.

In another instant message conversation – perhaps the strongest piece of evidence supporting the government's theory of the case – Mr. Barron told Mr. Heredia that he didn't want the expiration to run on several drugs that had been sitting at Red Mesa for some time, and so solicited Mr. Heredia for more business with this line: "Hook a brother up on scripts. I need some fake customers please. Mahahahaha." Aplt. App. at 793. From this message, one could surely infer that Mr. Barron knew that something was fishy at Red Mesa.

But, again, the difficulty is that this type of generalized knowledge isn't enough to sustain Mr. Barron's convictions under the CSA. *See, e.g.*, Jury Ins. at

27 ("[A] general suspicion that an unlawful act may occur or that something criminal is happening is not enough" to show aiding and abetting). At best, the instant message leaves a reasonable fact-finder with a number of equally reasonable inferences about what Mr. Barron might have thought was illicit at Red Mesa. The record, for example, supports the inference that Mr. Barron thought the pharmacy's customers were "fake" and the operation illicit because pharmacy customers never appeared at the pharmacy in person, but received their prescriptions by mail. The record also supports the inference that Mr. Barron thought the pharmacy acted unlawfully by relying on the Internet to receive and process orders. The trouble is that, to sustain his conviction, a fact-finder must be able to infer not only that Mr. Barron knew something was fishy at the pharmacy. A fact-finder must *also* be able to infer, more specifically, that Mr. Barron knew physicians working for SafeTrust and IntegraRx wrote prescriptions without first meeting with their patients, and that this failure to do so was inconsistent with legitimate medical practices or purposes. The instant message does not clearly suggest that Mr. Barron knew anything of the suit. Indeed, if anything, the word "fake" seems to suggest a belief that there weren't any customers on the other end of the prescriptions, not that there are real customers whose prescriptions were invalid for some other reason. Even viewing the message in the light most favorable to the jury's verdict, it gives us no way to distinguish among several plausible and competing inferences about its meaning. And where, as here, "the

evidence . . . gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances a reasonable jury *must necessarily entertain* a reasonable doubt." *United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005) (emphasis in original); *see also Ingram v. United States*, 360 U.S. 672, 680 (1959); *United States v. Dunmire*, 403 F.3d 722, 724 (10th Cir. 2005) ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable."). Put differently, the jury simply had no non-speculative reason to favor any one of these explanations over the others.

Much the same can be said of the remaining instant messages to which the government points. By way of example, in one conversation Mr. Heredia asked if Red Mesa could "fill 500 today," to which Mr. Barron replied, apparently after checking with his boss, Jerry Lovern, "Nope, Jerry said. And I need a centive to do that. I am getting paid any way and unless he send me 250 orders. And Jerry wants nothing over 300 aver. Gene is about 200 a day." Aplt. App at 794-95. ("Gene" likely refers to Eugene Patterson, a part-time pharmacist at Red Mesa.) This exchange may well suggest that Red Mesa's pharmacists sought to avoid the authorities' attention by keeping down the daily number of prescriptions they filled. Though seemingly just passing a message from Mr. Lovern, one might also infer from it that Mr. Barron was aware that not all was right at Red Mesa. But a

-25-

lot wasn't right about Red Mesa, and this message, like its predecessors, does nothing to suggest that Mr. Barron knew more specifically that what wasn't right was that the prescriptions Red Mesa filled were issued without a legitimate purpose or in defiance of contemporary medical standards.

3

Other evidence the government relies on is markedly less helpful to its case. The government points to the fact that a DEA registration certificate hung on a wall in the pharmacy near Mr. Barron's desk and that he "earned over $26,600.00 for a few months work." Appellee's Br. 31. The certificate, however, speaks not at all to the question whether Mr. Barron knew the prescriptions were issued outside the bounds of legitimate medical purposes or practices. Neither does the government explain how his salary (earned over eight months, not "a few" as the government suggests) indicates such knowledge. While Mr. Lovern asked for a pay raise after expressing concerns about the legality of the Red Mesa's operations, there is nothing in the record suggesting Mr. Barron did the same. Neither is there any evidence in the record, such as Mr. Barron's prior earning history, to suggest his income at Red Mesa was eye-popping in comparison. But even assuming that $26,000 is a lot of money for a person with Mr. Barron's experience and background, that fact would only (again) raise the inference that he suspected *something* was amiss at Red Mesa. He could have believed Internet pharmacies were categorically unlawful, or that he improperly

failed to register as a pharmacy technician, or that Red Mesa violated a state law

limiting customers' supplies of certain drugs, or that the suspended DEA license

rendered Red Mesa's operations invalid, or that some of the narcotics he helped

dispense were themselves prohibited. Any one of these potential illegalities could

have warranted a premium wage, and the government offers no rational, non-

speculative basis on which a fact-finder might prefer one of these inferences over

another. In the end, Mr. Barron's salary alone does not show beyond a reasonable

doubt that he knew that the SafeTrust and IntegraRx prescriptions he helped

process were issued outside the usual course of professional conduct or without a

legitimate medical purpose. Without proof of that knowledge, we cannot affirm

his conviction under the CSA, even if we might under some other legal theory.[5]

---

[5] We note the jury was instructed that it could find that Mr. Barron acted "knowingly" if it determined, beyond a reasonable doubt, that he "deliberately closed his eyes to what would have been obvious to him." Jury Ins. No. 30. On appeal, the government doesn't argue that the jury could have concluded Mr. Barron was deliberately ignorant about usual medical practices and purposes or how SafeTrust and IntegraRx physicians went about issuing prescriptions. Perhaps this is because a finding of deliberate ignorance is warranted only where the "defendant was aware of a high probability of the existence of the fact in question and *purposefully contrived* to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Cruz*, 58 F.3d 550, 557 (10th Cir. 1995) (emphasis added). The evidence the government cites us may suggest that Mr. Barron was inexperienced and ill-informed, but it does little to suggest he deliberately refrained from learning facts that would lead him to know the nature of the prescriptions Red Mesa filled. *Compare United States v. Soussi*, 316 F.3d 1095, 1107 (10th Cir. 2002) (upholding deliberate ignorance instruction where government's evidence showed, among other things, that defendant had deliberately refused to read document on

(continued...)

C

We disturb a jury's determination only with the greatest reluctance. But it is a bedrock promise of our criminal justice system that the evidence supporting a conviction "must raise more than the mere suspicion of guilt, and the jury's inferences must be more than speculation and conjecture in order to be reasonable." *United States v. Truong*, 425 F.3d 1282, 1288 (10th Cir. 2005) (internal quotation marks omitted). That, however, is all we have in this case. Mr. Barron very likely knew something was wrong at Red Mesa. But so many things were wrong, and the government's proof doesn't give a rational fact-finder any reason to think that, among them all, Mr. Barron knew of the particular problem that gives rise to liability under the CSA as opposed to, say, state law or regulation. In these circumstances, we are obligated to hold that the evidence is legally insufficient to support Mr. Barron's convictions and to reverse them. *See, e.g.*, *United States v. Thomas*, 114 F.3d 403, 405 (3d Cir. 1997) (reversing conviction because, while the evidence showed that the defendant "knew that he was somehow involved in an illicit activity," it didn't show beyond a reasonable doubt the "essential element that he knew that the purpose of the agreement was the specific unlawful purpose charged in the indictment"). Having reached this

---

[5](...continued) export ban, "presumably because he wanted to avoid unequivocal knowledge it was illegal for him to engage in the [illicit] transaction" that was the subject of the case).

-28-

conclusion, we have no need to address Mr. Barron's remaining arguments on appeal.

* * *

The CSA prohibits the *knowing* distribution of prescriptions issued without a legitimate medical purpose or outside the usual course of professional practice. By the close of trial, there could be no reasonable doubt that Mr. Lovern, with his forty-five years of pharmaceutical experience and detailed understanding of Red Mesa's operations, knew that the pharmacy's prescriptions were issued under circumstances that did not comport with contemporary medical practices or with legitimate medical purposes. But exactly this same evidence was missing against Mr. Barron, who, with apparently no previous pharmaceutical knowledge or training, was brought on board to assist in simple computer tasks. Mr. Lovern's convictions are affirmed; Mr. Barron's are reversed with instructions to the district court to enter a judgment of acquittal.

08-3141, *United States v. Lovern* and 08-3149, *United States v. Barron*

**O'BRIEN**, J., dissenting.


I agree with the majority's decision affirming Lovern's convictions. I disagree, however, that no reasonable jury could have found Barron guilty. *See United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005) (stating our review of the sufficiency of the evidence is "highly deferential as we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was guilty of the crime charged") (quotations omitted).

The majority says the government presented no evidence suggesting Barron possessed the necessary *mens rea*, specifically, that he knew the prescriptions he helped distribute were outside the usual course of professional practice or without a legitimate medical purpose. For what it is worth, there was no direct evidence of the scope of his knowledge (there seldom is in cases of this nature). But there was evidence from which reasonable and sufficient inferences could be drawn. According to the majority, the evidence showed Barron was a high-school dropout with no experience in the medical or pharmaceutical field who merely served as the pharmacy's computer technician, suggesting that he was a dumb lackey, intentionally kept out of the loop. That is a fair inference, but not the only one to reasonably be drawn from the facts. And, under our system, the inferences that count are those drawn by the jury. We must "accept the jury's resolution of the

evidence as long as it is within the bounds of reason." *United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir.), *cert. denied*, 551 U.S. 1110 (2007). Because it was quite reasonable for the jury to find Barron had the requisite knowledge, I respectfully dissent.

Barron was charged and convicted of three substantive counts of distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) and aiding and abetting the same, as well as one count of conspiring with named and unnamed coconspirators to commit the substantive offense. The jury was instructed that a "non-pharmacist employee of a pharmacy may assist in filling a prescription for a controlled substance without violating Section 841, unless the employee does so knowing that the prescription was not issued for a legitimate medical purpose or in the usual course of medical practice." (R. Vol. 1 at 216.) It was told that to be found guilty of distribution of a controlled substance outside the course of professional medical practice or without a legitimate medical purpose, it had to find the government proved the following beyond a reasonable doubt:

> [1] the defendant knowingly or intentionally distributed a prescription drug that is a controlled substance . . ., [2] the defendant knew it was some type of controlled substance, and [3] the defendant knew he was distributing the substance outside the usual course of professional medical practice or without a legitimate medical purpose.

(*Id.* at 220.)

-2-

The jury was further told that to be found guilty of conspiring to commit the substantive offense, the government must show beyond a reasonable doubt:

> [1] two or more persons agreed to distribute controlled substances outside the usual course of professional medical practice or without a legitimate medical purpose . . .; [2] the defendant knew the essential objective of the conspiracy; [3] the defendant knowingly and voluntarily joined in the conspiracy; and [4] there was interdependence among the members of the conspiracy . . . .

(*Id.* at 217.)  And the instructions provided guidance on each of these elements. The jury was told Barron may be found guilty of the substantive offense if he aided or abetted its commission:

> Th[e] law makes it a crime to intentionally help someone else commit a crime.  To find a defendant guilty of [aiding and abetting], you must be convinced that the Government has proved each of the following beyond a reasonable doubt:
>
> First, someone else committed the crime charged . . .; and
>
> Second, the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about.  This means the Government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.
>
> The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting.  But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough.  Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

(*Id.* at 221.)

-3-

Finally, the jury was told that to sustain its burden of proof on the conspiracy and substantive counts, the government was required to prove beyond a reasonable doubt that Barron acted "other than in good faith for a legitimate medical purpose and in the usual course of professional practice in accordance with a standard of medical practice generally recognized and accepted in the United States." (*Id.* at 223-24.) And:

> In determining whether or not a defendant acted in good faith in the course of a medical practice, you may consider all of the evidence in the case which relates to that conduct. Among other factors, you should consider any evidence pertaining to the particular position held by the defendant and whether the defendant had any specialized training or knowledge concerning the usual course of medical practice.

(*Id.* at 224.)

Barron does not challenge the propriety of these jury instructions and they are consistent with our case law and the statutory and regulatory scheme. *See* 18 U.S.C. § 2, 21 U.S.C. §§ 829, 841(a), 846; 21 C.F.R. § 1306.04(a); *see also United States v. Celio*, 230 Fed. Appx. 818, 824-26 (10th Cir.) (unpublished) (substantive offense), *cert. denied*, 128 S. Ct. 301 (2007) [1]; *United States v. Isaac-Sigala*, 448 F.3d 1206, 1210 (10th Cir. 2006) (conspiracy); *United States v. Sarracino*, 131 F.3d 943, 946 (10th Cir. 1997) (aiding and abetting); *United*

---

[1] Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). I mention *Celio* as I would opinions from another circuit, persuasive because of their reasoned analyses.

*States v. Verners*, 53 F.3d 291, 295 (10th Cir. 1995) (aiding and abetting). Following these instructions, which gave ample opportunity for acquittal, the jury found Barron guilty. And there was sufficient evidence, if reasonable inferences be allowed, to support the jury's verdict.

Barron worked closely with Hilst and Lovern. He printed the labels for the illegal prescriptions, to be filled by Lovern. He inquired of the Board of Pharmacy as to whether he was required to be registered as a technician to work in the pharmacy. Although the Board answered in the affirmative, Barron never registered. Based on his interview responses to an agent, Barron knew the pharmacy did not communicate with prescribing physicians; no customers came into the pharmacy; the pharmacy did not initially have a pharmacist; when the pharmacy did hire a pharmacist, the pharmacist backed out; Hilst had once attempted to determine whether a prescribing doctor existed; and Barron was told by his wife, who had worked as a surgical technician, that she did not believe the pharmacy's operations were legit.

Most damaging, however, are the instant messages between Barron and Heredia (who was in Costa Rica). In one message, Barron told Heredia he had a number of drugs that had been sitting at the pharmacy for a long time which he wished to dispose of before their expiration date. He asked Heredia to "hook a brother up on scripts" and said he "need[ed] some fake customers pleaasssssse [sic]." (R. Supp. App. at 64.) In another message Heredia asked Barron if the

pharmacy could "fill 500 today?" (*Id.* at 65.) Barron replied, "nope jerry [Lovern] said" followed by "and I need a centive [sic] to do that." Barron added, "what he pays me is about 250 orders" and "jerry wants nothing over 300." (*Id.*) Other messages between the two indicated Barron was aware of the controlled nature of the drugs being distributed.

A reasonable jury could conclude Barron knew the pharmacy's drug operations were illegal and more specifically that he knew the distribution of the controlled substances occurred without a legitimate medical purpose. It doesn't take medical or pharmaceutical experience (or even a high school diploma) to know issuing prescriptions to fake customers is not within the normal course of a doctor's practice or for a legitimate medical purpose.

Although the majority discounts it as not "eye-popping," Barron was paid $26,600 for the eight months he worked at the pharmacy. (Majority Op. at 27.) Assuming he worked 40 hours per week, this amounts to a little more than $20 per hour. A reasonable jury could infer this was an exorbitant amount of money given, as the majority says, Barron is "a high school drop-out with no experience in the medical or pharmaceutical fields" who "performed only menial computer tasks" at the pharmacy and who "did not even pick which particular prescriptions the pharmacy filled–Mr. Hilst sat by him and directed him on which boxes to check." (*Id.* at 2, 20-21.) A jury could reasonably infer (as it apparently did) Barron was paid a relatively handsome wage because he knew was participating

in illegal activity, a risk worth taking only for additional compensation.  The implications of Barron's earnings are not beyond the ken of a jury, even if there was no positive proof of his historical pay records.

As the district court aptly said: "[T]he court cannot say it is illogical or speculation for a jury to infer the requisite knowledge given [Barron's] role at the pharmacy, his disregard of Board of Pharmacy requirements, his awareness of the questionable legality of the pharmacy's operations, his communications back and forth between Hilst, Lovern and Heredia, and his receipt of an unusual amount of money from Hilst.  *Although a different jury might have drawn different inferences, the jury's verdict as to Mr. Barron represents a permissible view of the evidence*."  (R. Supp. App. at 67 (emphasis added).)